## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | **Chapter 13** |
| | : | |
| **SUZANNE L. BOGER,** | : | |
| | : | **Bankruptcy No. 19-16411-AMC** |
| **DEBTOR** | : | |
| ————————————— | : | |
| | : | |
| **SUZANNE L. BOLGER,** | : | |
| | : | |
| **PLAINTIFF** | : | |
| | : | **Adv. Proc. No. 13-00669-AMC** |
| **V.** | : | |
| | : | |
| **JACQUELINE MCCUSKER AND** | : | |
| **JPMORGAN CHASE BANK N.A.,** | : | |
| | : | |
| **DEFENDANTS** | : | |
| ————————————— | : | |

Ashely M. Chan, United States Bankruptcy Judge

### OPINION

## I.    INTRODUCTION

By way of background, in July 2005, Suzanne Bolger ("Debtor") and Charles Bolger, her then-husband ("Mr. Bolger"), transferred title to their residential real property located at 1575 Doerr Road, Quakertown, PA ("Property") to Jacqueline McCusker ("McCusker") allegedly in order to stay a sheriff's sale of the Property. Case No. 13-669 ECF Doc. ("ECF") 1, Compl. Ex. B; ECF 23, Am. Compl. ¶¶ 6, 8, 9. In exchange, Debtor and Mr. Bolger would retain possession of the Property pursuant to a lease agreement, as well as the option to re-purchase the Property using a credit in the amount of 50% of the Property's equity. Compl. Ex. C, D. Concurrent with the sale of the Property, McCusker executed a note and mortgage against the Property to finance its purchase. *Id.* at Ex. A. A few years later, McCusker re-financed that obligation with

1

Washington Mutual Bank ("WaMu"). Am. Compl. ¶ 26. *See also* Case No. 13-669 ECF 276, Ren. Summ. J. Mot. St. Undisputed Facts p. 3, Grageda Decl. Ex. 1, 2. Subsequently, JPMorgan Chase Bank, N.A. ("Chase") acquired the loan McCusker had taken out with WaMu from the Federal Deposit Insurance Corporation ("FDIC") acting as receiver for WaMu, and thereafter initiated foreclosure proceedings against the Property, eventually obtaining a judgment against the Property in March 2010. Ren. Summ. J. Mot. St. Undisputed Facts p. 3, Grageda Decl. ¶ 3.

In this adversary proceeding, Debtor now essentially alleges that to induce Debtor to relinquish title to the Property, McCusker made certain false representations, including that she would preserve the equity in the Property to apply towards the Debtor's re-purchase of the Property rather than diverting it to a company which McCusker owns, and that the alleged fraud renders McCusker's title and Chase's interest in the Property by virtue of the loan McCusker took out against the Property with WaMu invalid. Am. Compl. ¶¶ 8, 9, 33-44. Chase now moves for summary judgment in its favor on the basis that there is no genuine dispute that the *D'Oench Duhme* doctrine and/or 12 U.S.C. § 1823(e) bars the Debtor's claims against Chase as a matter of law. Ren. Summ. J. Mot. p. 5-9. Ultimately, because 12 U.S.C. § 1823(e) bars the Debtor from raising McCusker's alleged misrepresentations, including those related to the side option to purchase agreement, to attempt to diminish or defeat Chase's interest in a facially unconditional note secured by a mortgage against the Property which Chase acquired from FDIC when no written acknowledgment of those misrepresentations signed by WaMu appears anywhere in WaMu's loan file, the Court will grant summary judgment in favor of Chase.

## II.    FACTUAL & PROCEDURAL BACKGROUND

On April 11, 2013, Debtor filed a petition for relief under chapter 13 of the Bankruptcy Code. Case No. 13-13214 ECF 1. The Debtor commenced this adversary proceeding on

December 24, 2013 by filing a complaint ("Original Complaint") against defendants Chase and

McCusker to recover free and clear title to the Property which had allegedly been transferred to

McCusker pursuant to a mortgage foreclosure rescue scam ("Adversary Proceeding"). Case No.

13-0669 ECF 1, Compl. ¶¶ 9, 10, 26-35. On March 5, 2014, Chase filed a motion to dismiss the

Original Complaint for failure to state a claim upon which relief could be granted ("First Motion

to Dismiss"). Case No. 13-669 ECF 11. The Court granted the First Motion to Dismiss as to

Chase without prejudice on April 16, 2014, but also granted Debtor leave to file an amended

complaint. *Id.* at ECF 17, 18.

On April 28, 2014, Debtor filed an amended complaint ("Amended Complaint"). *Id.* at

ECF 23. The Amended Complaint alleges, *inter alia*, that in 2005, the Property was scheduled

for sheriff's sale in Bucks County, Pennsylvania. Am. Compl. ¶ 6. After receiving an

advertisement in the mail for "Foreclosure Relief Services" from "Defendant-McCusker or from

an entity or person acting at the direction of, in concert with, or in conspiracy with Defendant-

McCusker," the Debtor and Mr. Bolger allegedly entered into an agreement with McCusker

whereby McCusker would purchase the Property for $300,000, lease it back to Debtor and Mr.

Bolger for $925/month, and grant Debtor and Mr. Bolger the option to re-purchase the Property.

*Id.* at ¶¶ 7, 8, 9. The Amended Complaint goes on to allege that Long Beach Mortgage agreed to

provide financing to McCusker to fund her purchase of the Property. *Id.* at ¶ 18.

According to the Amended Complaint, on July 7, 2005, the settlement date for the sale of

the Property to McCusker, McCusker executed a mortgage in favor of Long Beach Mortgage

against the Property in the principal amount of $240,000 ("Long Beach Mortgage Obligation").

*Id.* at ¶¶ 14, 19. The same day, Debtor and Mr. Bolger executed and delivered a deed to the

Property conveying ownership to McCusker; executed a residential lease agreement for the

Property with J&J Realty Acquisition, LLC ("J&J Realty"), an entity allegedly owned by

McCusker, acting as landlord ("Lease Agreement");[1] and executed a document with J&J Realty

entitled "Option Agreement." *Id.* at ¶¶ 9(d), 15, 16; Compl. Ex. B, Ex. C, Ex. D.

Pursuant to the Option Agreement, a copy of which is attached to the Original Complaint

and referenced in the Amended Complaint, J&J Realty was identified as "Seller" and Debtor and

Mr. Bolger were identified as "Buyer." Compl. Ex. C. Under the Option Agreement, J&J Realty,

Debtor, and Mr. Bolger agreed "as long as Buyer is not in default of any of its obligations under

the Lease Agreement dated July 7, 2005," Debtor and her husband would have the option to

purchase the premises under certain conditions. *Id.* Specifically, the Option Agreement provided

that "[t]he total purchase price to be paid by Buyer to Seller for the Premises (the 'Purchase

Price') shall be equal to the value of the property as determined by an appraisal to be conducted

at the time of conveyance. Seller shall issue to Buyer a credit at the closing equal to fifty per cent

(50%) of the equity remaining at the time of conveyance." *Id.*

The HUD-1 settlement statement executed on July 7, 2005 by McCusker and Mr. Bolger

in connection with the sale of the Property ("Settlement Statement"), and attached to the Original

Complaint and referenced in the Amended Complaint, reflects that the sale proceeds were

applied to pay: $161,103.94 in satisfaction of the first mortgage on the Property held by

Greenpoint Mortgage Company; $10,262.51 in satisfaction of a lien apparently held by

Resurgent Capital Services; $4,299 in satisfaction of "settlement charges to seller"; and

$124,504.07, the remaining equity, to J&J Realty despite it allegedly having no lien against the

Property. Am. Compl. ¶¶ 9, 14; Compl. Ex. A.

---

[1] Pursuant to the Lease Agreement, a copy of which is attached to the Original Complaint and referenced in the Amended Complaint, Debtor and Mr. Bolger agreed to pay $925/month and that "Tenant agrees that the monthly rent shall be adjusted from time to time to reflect any increases in property taxes and/or homeowner's insurance policy premiums during Tenant's occupancy." Compl. Ex. D.

According to the Amended Complaint, on July 8, 2005, the day after settlement for the sale of the Property to McCusker, the sheriff's sale of the Property was stayed. Am. Compl. ¶ 24. On and subsequent to the settlement date, Debtor allegedly continued to reside in the Property under the Lease Agreement, and paid rent until October 2008.[2] *Id.* at ¶¶ 9(g), 21, 25, 27; Compl. Ex. D, E, F. Meanwhile, according to the Amended Complaint, in or around July 2007, McCusker re-financed the Property's Long Beach Mortgage Obligation with WaMu during the time Debtor continued to reside in the Property, and Chase subsequently "acquired Washington Mutual Bank" and "stands in the shoes of Washington Mutual." Am. Compl. ¶¶ 26, 27, 30.

In February 2009, Debtor was allegedly contacted by an agent from the Federal Bureau of Investigation ("FBI") as part of an investigation into McCusker, and was advised not to pay rent. *Id.* at ¶ 10. Meanwhile, in January 2010, Chase initiated mortgage foreclosure proceedings against the Property in the Bucks County Court of Common Pleas, and on March 15, 2010, judgment was entered in favor of Chase. *Id.* at ¶¶ 31, 32. Thereafter, on June 22, 2011, McCusker was found guilty of conspiracy, wire fraud, mail fraud, and conspiracy to launder money for her role in a fraudulent foreclosure rescue scam executed against certain individuals. *Id.* at ¶ 12; *United States v. McCusker,* Crim. Act. Nos. 09-771-1, 5, 2012 WL 6628027, at *2 (E.D. Pa. Dec. 20, 2012).

Ultimately, the Amended Complaint contends that "[d]efendant-McCusker falsely promised to help Plaintiff and her then husband save the home from sheriff's sale" and that "[d]efendant-McCusker defrauded the Plaintiff and her then husband" through the above-described "scheme," specifically alleging that "[r]ather than preserve equity in the Home to be

---

[2] In a letter addressed to the Debtor dated June 6, 2006, she was notified by a representative of J&J Realty of "a rent payment increase from $925 to $1,071/month effective immediately due to an increase in home owner [sic] insurance." Compl. Ex. E. On July 31, 2008, Debtor executed a new lease agreement as tenant with McCusker as landlord wherein Debtor agreed to pay $2,000/month in rent. *Id.* at Ex. F.

applied toward the Plaintiff's purchase option as agreed, Defendant-McCusker eliminated such

equity by causing the cash value of such equity to be transferred to J&J Realty Acquisition"

when "[d]efendant McCusker had no intention and no ability to replace the equity in the Home at

the time of the exercise of the Plaintiff's option to purchase." Am. Compl. ¶¶ 8, 9. The Amended

Complaint further avers that Long Beach Mortgage either "knew the transaction was a scheme

designed to deprive Plaintiff and her then husband of title to and all equity in the Home and was

aware of Exhibit C [the Option Agreement], or Long Beach Mortgage would have easily

discovered the nature of the transaction, including the existence of Exhibit C, by making

reasonable inquiry regarding the continued occupancy of Plaintiff…in the Home," and that

WaMu and Chase had at least constructive knowledge that Debtor had been the alleged victim of

a foreclosure rescue scheme. *Id*. at ¶¶ 22, 28, 38, 44.

Accordingly, based on all the foregoing, the Amended Complaint brings two counts

against Chase. Count I for "conversion & quiet title" seeks to have the Debtor recover title to the

Property and to have the Court declare Chase's mortgage against the Property invalid based upon

its constructive knowledge of McCusker's alleged fraud in connection with the sales transaction.

*Id.* at ¶¶ 33-38. Count II for "fraud" similarly seeks to have the Debtor recover title to the

Property and to have the Court declare Chase's mortgage against the Property invalid based upon

Chase's constructive knowledge of McCusker's knowing misrepresentations in connection with

the sales transaction, including regarding "the Plaintiff's ability to repurchase the Home and the

amount she would need to pay to Defendant-McCusker to remain [in] or to repurchase the

Home." *Id.* at ¶¶ 39-44.

On August 11, 2014, Chase filed a motion to dismiss the Amended Complaint for failure

to state a claim upon which relief could be granted ("Second Motion to Dismiss"). Case No. 13-

669 ECF 40. On December 12, 2014, the Court denied Chase's Second Motion to Dismiss. *Id.* at

ECF 55, 56. Thereafter, on January 12, 2015, Chase filed an answer to the Amended Complaint

("Answer"). *Id.* at ECF 61. The Answer raised six affirmative defenses – (1) that the Amended

Complaint failed to join Mr. Bolger as an indispensable party; (2) the doctrine of laches; (3)

Debtor's knowing participation in the "foreclosure rescue scam" allegedly perpetrated by

McCusker; (4) WaMu and Chase's status as bona fide mortgagees for value without actual or

constructive knowledge of the alleged foreclosure rescue scam perpetrated by McCusker; (5)

Chase's entitlement to an equitable lien against the Property in the event Debtor succeeds in

setting aside Chase's mortgage; and (6) Chase's entitlement to be "subrogated to the rights of the

prior mortgagees who were paid with the funds" WaMu advanced in satisfaction of prior

mortgages on the Property. Ans. ¶¶ 49-66.

On February 5, 2015, Debtor filed a "Joint Statement of Consent to Participate in the

Court-Annexed Mediation Program" executed by both counsel for Debtor and counsel for Chase

representing:

> Plaintiff…and JPMorgan Chase Bank…hereby file a Joint Statement of Consent to
> Participate in the Court-Annexed Mediation Program. However, the parties are in the
> process of negotiating to resolve the case on their own and request that they be permitted
> to notify the Court if their settlement discussions are successful or not, and if not, that the
> Parties be permitted to advise the Court as to whether they would like to be assigned to
> mediation at that time.

Case No. 13-669 ECF 65.

Over the next several years, Debtor and Chase engaged in extensive settlement negotiations,

including mediation with the undersigned.

Meanwhile, on February 7, 2019, the Debtor received her chapter 13 discharge. Case No.

13-13214 ECF 135. On February 8, 2019, an order was entered discharging the chapter 13

trustee and closing the main bankruptcy case. *Id.* at ECF 136. As of that time, while Debtor and

Chase had appeared to make significant progress towards a settlement of this Adversary

Proceeding, they ultimately had been unable to reach a consensual resolution by that point.

Therefore, shortly after the Debtor obtained her discharge, Chase scheduled a sheriff's sale of the

Property for October 11, 2019. On October 11, 2019, the Debtor filed another chapter 13

bankruptcy petition ("Second Bankruptcy Case"). Case No. 19-16411 ECF 1. Although Chase

had largely abandoned settlement efforts with respect to the Adversary Proceeding by that point,

the Debtor continued to pursue financing from Blue Hub Capital ("Blue Hub") in hopes of

funding a consensual resolution with Chase.

A few months later, on December 13, 2019, Chase filed a motion to dismiss the

Adversary Proceeding pursuant to Federal Rule of Civil Procedure 37 based upon what Chase

considered to be Debtor's insufficient response to Chase's discovery requests ("Third Motion to

Dismiss"). Case No. 13-669 ECF 179. Debtor failed to file a response to the Third Motion to

Dismiss. Therefore, on January 7, 2020, the Court entered an order granting the Third Motion to

Dismiss ("Dismissal Order"). *Id.* at ECF 183. On January 20, 2020, the Debtor filed a motion to

reconsider the Dismissal Order ("Reconsideration Motion"). *Id.* at ECF 186. Hearings were held

on the Reconsideration Motion on February 11, 2020 and March 11, 2020. *Id.* at ECF 189, 193,

198. At the March 11, 2020 hearing, it appeared that Debtor would soon potentially be in a

position to attempt to make another settlement offer to Chase with the assistance of financing

from Blue Hub. Accordingly, the Court gave Debtor until March 13, 2020 to make a settlement

offer to Chase, and gave Chase until March 20, 2020 to respond to the settlement offer. *Id.* at

ECF 198. The Court directed that if Chase and the Debtor were unable to reach a settlement, they

should submit certain supplemental briefing on the Reconsideration Motion. *Id.*

Ultimately, Chase and the Debtor did not reach a consensual resolution of the Adversary

Proceeding.[3] Accordingly, after Chase and the Debtor filed supplemental briefing on the

Reconsideration Motion, the Court held a hearing on the Reconsideration Motion on September

22, 2020. *Id.* at ECF 199, 200, 201, 202, 203, 204, 213. On September 23, 2020, the Court issued

an order granting the Reconsideration Motion; vacating the Dismissal Order; directing Debtor to

supplement her discovery response within thirty days and work with Chase to propose new pre-

trial deadlines; and transferring the Adversary Proceeding to the Second Bankruptcy Case. *Id.* at

ECF 214.

On January 7, 2021, the Court entered the amended pre-trial order proposed by the

Debtor and Chase setting March 1, 2021 as the deadline for discovery, and March 15, 2021 as

the deadline for filing motions addressing any discovery disputes. *Id.* at ECF 220, 221.

Thereafter, on February 4, 2021, Chase filed a motion for summary judgment asserting for the

first time that the Debtor's claims against Chase are barred by the *D'Oench Duhme* doctrine and

12 U.S.C. § 1823(e) ("First Summary Judgment Motion"). *Id.* at ECF 223. On March 2, 2021,

Chase filed a request for entry of judgment after Debtor failed to respond to the First Summary

Judgment Motion ("Judgment Request") by the February 25 response deadline. *Id.* at ECF 225,

234. On March 4, 2021, in response to Chase's Judgment Request, the Debtor filed a request for

an extension of time to respond to the First Summary Judgment Motion based largely on not

receiving Chase's discovery responses until after the deadline for responding to the First

Summary Judgment Motion had passed, and Debtor's need to seek supplemental discovery

---

[3] The Court understands that the Debtor may believe that over the course of their various settlement discussions, the Debtor and Chase reached one or more enforceable agreements. The Court in summarizing the procedural background of this Adversary Proceeding expresses no position on the enforceability of any terms to which Chase and the Debtor may have agreed over the course of their various settlement discussions.

responses from Chase in relation to the new *D'Oench Duhme* doctrine/12 U.S.C. § 1823(e)

defense referenced in the First Summary Judgment Motion. *Id.* at ECF 235, App. ¶¶ 3, 4, 5, 6, 7.

On March 8, 2021, the Court directed Chase to, in support of the Judgment Request, "file

a letter brief, with appropriate citations to applicable bankruptcy rules including, but not limited

to Rule 56, and applicable case law, which, in light of Debtor's failure to timely respond to the

Motion, sets forth those material facts which may be deemed by the Court to not be in dispute for

purposes of resolving the Motion" by March 17, 2021. Case No. 13-669 ECF 238. The Court

gave the Debtor until March 29, 2021 to file a response to the letter brief, and permitted Chase to

file any reply on or before April 2, 2021. *Id.* A hearing on Chase's Judgment Request was set for

April 6, 2021. *Id.*

Debtor's response to Chase's letter brief raised, *inter alia*, that Federal Rule of Civil

Procedure 56 only permits the Court to grant summary judgment on a claim or defense which

had been raised in the pleadings, and neither the *D'Oench Duhme* doctrine nor 12 U.S.C.

§1823(e) had ever been raised as a defense in the pleadings ("Debtor's Letter Response"). Case

No. 13-669 ECF 246, Debtor Letter Brief p. 5, 8. Specifically, Debtor's Letter Response

asserted:

> Plaintiff/Debtor believes that the Court should first consider the fact that the
> issues raised by Chase are not properly before the Court as set forth above. For
> that reason alone, the Chase Motion for Summary Judgment should be dismissed,
> but if it is not, given the fact that the *D'Oench Duhme* doctrine and §1823(e) were
> not part of any previous Motion to Dismiss or responsive pleading filed by Chase,
> the Court should require Chase to file any appropriate motion seeking leave to
> amend its pleadings, and evaluate whether or not to grant any such motion under
> prevailing law; Plaintiff/Debtor would oppose any such motion filed by Chase. If
> Chase nonetheless were to be permitted to amend its Answer and affirmative
> defenses to properly set forth any defense to the Plaintiff's Amended Complaint
> not previously raised, and Chase re-files the Motion for Summary Judgment or a
> similar such motion, given the fact that Chase filed the current Motion for
> Summary Judgment after the time when Plaintiff/Debtor would have had to
> propound any additional discovery, the Court should also take into account Rule

10

56(d), which provides that '[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.' In that case, Plaintiff would request that the Court grant her appropriate relief under Rule 56(d), and allow her an opportunity to oppose any such new Chase theory of defense interposed more than seven years into this Adversary Proceeding.

*Id.* at p. 8-9.

On April 6, 2021, after a hearing on Chase's Judgment Request, the Court entered an order denying Chase's Judgment Request based upon Chase's failure to raise the *D'Oench Duhme* doctrine and 12 U.S.C. § 1823(e) prior to the First Summary Judgment Motion and directing Chase "to file a motion to amend its answer, if it so chooses to do so, on or before May 6, 2021…" Case No. 13-669 ECF 250, 251.

On April 21, 2021, Chase filed a motion to amend the Answer ("Amendment Motion") for the purpose of adding "an affirmative defense, based upon the *D'Oench Duhme* doctrine, as codified in" 12 U.S.C. § 1823(e). *Id.* at ECF 254, Am. Mot. p. 1-2. The deadline for responding to the Amendment Motion was set for May 5, 2021. Case No. 13-669 ECF 255. The Debtor did not file any objection response to the Amendment Motion. On June 1, 2021, the Court granted the Amendment Motion, and directed Chase to file its amended answer within thirty days. *Id.* at ECF 258. Chase filed its amended answer ("Amended Answer") on June 3, 2021, which added 12 U.S.C. § 1823(e) as an affirmative defense. *Id.* at ECF 260, Am. Ans. ¶¶ 67-68. On July 7, 2021, the Court entered another amended pre-trial order providing, *inter alia*, that

> [a]t Plaintiff's election, Plaintiff may engage in discovery solely with respect to any changes in JPMC's Answer and Affirmative Defenses to Plaintiff's Amended Complaint (Docket No. 260) from JPMC's Answer and Affirmative Defenses to Plaintiff's Amended Complaint (Docket No. 61) [sic]. Absent any further written agreement between the parties or Court Order, such discovery by Plaintiff must be completed no later than September 1, 2021.

Case No. 13-669 ECF 264.

Debtor claims to have served discovery requests on Chase on July 30, 2021. *See* Case No. 13-669 ECF 273, Mot. to Strike ¶ 6. According to Debtor, Chase delivered its response to the discovery requests on August 30, 2021, but Debtor was unsatisfied with the response, contending "Chase failed to respond substantively to any of the discovery requests largely on the ground that Chase believed its responses would not be due until September 2, 2021…" *See* Case No. 13-669 ECF 273, Mot. to Strike ¶ 7; ECF 278, Mot. to Extend ¶ 5.

On September 2, 2021, Chase re-noticed its First Summary Judgment Motion for a hearing and filed a "Separate Statement of Material Facts in Support of Summary Judgment." Case No. 13-669 ECF 266, 267. The response deadline was set for September 16, 2021. *Id.* at ECF 266. Debtor did not file a response. On October 19, 2021, Chase filed another "Request for Entry of Judgment" ("Second Judgment Request"). *Id.* at ECF 270. On October 21, 2021, the Court set a hearing on the First Summary Judgment Motion for December 7, 2021.

On December 7, 2021, the day of the hearing on the First Summary Judgment Motion, Debtor filed a motion to strike Chase's September 2 notice issued in connection with the First Summary Judgment Motion and "Separate Statement of Material Facts in Support of Summary Judgment Motion," ("Motion to Strike") on the basis that the Court had already denied the First Summary Judgment Motion and it "could not be resurrected by merely filing a 'Notice of Motion and Response Deadline', and a 'Separate Statement of Material Facts in Support of Summary Judgment', when there was no underlying motion for summary judgment pending with the Court…" Case No. 13-669 ECF 273, Mot. to Strike ¶¶ 2, 8, 9, 10. A hearing was set for the Motion to Strike for February 15, 2022, and the hearing on the First Summary Judgment Motion was adjourned to the same day. Case No. 13-669 ECF 275.

Thereafter, on December 16, 2021, in response to the Motion to Strike, without concoding that re-noticing the First Summary Judgment Motion had been improper, Chase filed a "renewed" motion for summary judgment ("Renewed Summary Judgment Motion") at the Court's request, re-asserting the *D'Oench Duhme* doctrine and 12 U.S.C. § 1823(e) as the bases for summary judgment. *Id.* at ECF 276. The response deadline for the Renewed Summary Judgment Motion was set for January 6, 2022, and a hearing was set for February 15, 2022. *Id.* at ECF 277. The Renewed Summary Judgment Motion contains the following "Statement of Undisputed Facts":

> [i]n 2005, Plaintiff and her then-husband entered into an agreement with Defendant Jacqueline McCusker ('McCusker') pursuant to which title to the property located at 1575 Doerr Road, Quakertown, Pennsylvania ('Property'), which at the time was facing foreclosure, was transferred to McCusker, McCusker leased the Property back to the Bolgers, and the Bolgers had the option to repurchase the Property from McCusker. Am. Compl. ¶¶ 6, 8. As part of the transaction pursuant to which McCusker obtained title to the Property McCusker borrowed $240,000 from Long Beach Mortgage secured by a mortgage on the Property and diverted the loan proceeds, less payments to existing lien holders and transaction expenses, in the sum of $124,504 to J&J Realty Acquisition Corp., McCusker's company. *Id.* at ¶ 9. The complaint before the Court contends that Bolger was defrauded by McCusker and is entitled to obtain title to the Property from McCusker.

> In July 2007, McCusker refinanced the Long Beach Mortgage with Washington Mutual Bank ('Washington Mutual'). *Id.* ¶ 26. In September 2008, JPMC acquired the Washington Mutual loan from the Federal Deposit Insurance Corporation ('FDIC') as receiver of Washington Mutual. Declaration of Evan L. Grageda ('Grageda Decl.'), ¶ 3; Am. Compl. ¶ 30. Upon acquiring the loan from the FDIC, JPMC also acquired the Washington Mutual loan file. Grageda Decl. ¶4. McCusker subsequently defaulted on the Washington Mutual loan, and in March 2010, a judgment in foreclosure was entered in favor of JPMC. Am. Compl. ¶¶ 31-32.

> JPMC is the current holder of the originally signed Washington Mutual note dated July 9, 2007, in the original principal sum of $232,500.00, made by Jacqueline McCusker in favor of Washington Mutual (the 'Note') which is secured by a mortgage encumbering the Property. Grageda Decl. at ¶¶ 2 and 3, Ex. 2. The Note is secured by a mortgage encumbering certain real property located at the Property. Grageda Decl. at ¶ 2, Ex. 1. JPMC acquired the Note from the Federal

Deposit Insurance Corporation acting as Washington Mutual's receiver. Grageda
Decl. at ¶ 3. The Washington Mutual loan file that was transferred to JPMC upon
JPMC's acquisition of the loan from the FDIC does not contain any reference to
Suzanne Bolger or her then-husband having any interest in the Property, nor does
it otherwise indicate that there was any fraud perpetrated in connection with the
Washington Mutual loan. Grageda Decl., Ex. 3. There is no written agreement in
Washington Mutual's files that has been signed by Washington Mutual
acknowledging Plaintiff's claimed interest in the Property. Grageda Decl. at ¶ 4,
Ex. 3. Nonetheless, Bolger now contends that the mortgage now held by JPMC is
invalid based upon the fraud allegedly perpetrated by McCusker.

Ren. Summ. J. Mot. Pt. I.

On January 6, 2022, the Debtor filed a motion for an extension of time to file an

opposition response to the Renewed Summary Judgment Motion ("Extension Motion"),

representing that Debtor still needed to obtain adequate discovery responses from Chase and

would file a motion to compel discovery if Chase did not voluntarily supplement its response to

Debtor's July 30 discovery requests. Case No. 13-669 ECF 278, Mot. to Extend ¶¶ 5, 7.

According to the Extension Motion, Debtor's counsel had previously been unable to file a

motion to compel because he "was exposed to two people who contracted COVID-19 over the

holiday period and had to self-quarantine…" resulting in him not returning to his office until the

week of January 3, 2022 to a backlog of work he had to address before addressing the

outstanding matters in this Adversary Proceeding. *Id.* at ¶ 8. The Extension Motion did not

explain what prevented him from filing a motion to compel adequate discovery responses from

Chase in September, October, or November 2021 upon receiving Chase's discovery responses on

August 30, 2021, especially in light of Chase's September 2, 2021 re-noticing of the First

Summary Judgment Motion, which raises the exact same issues as the Renewed Summary

Judgment Motion–the applicability of the *D'Oench Duhme* doctrine and 12 U.S.C. § 1823(e) to

this Adversary Proceeding. Ultimately, Debtor specifically requested that the Court extend the

time to file her opposition response to the Renewed Summary Judgment Motion until "at least

January 14, 2022," although the hearing on the Extension Motion was set for February 8, 2022,

the week before the hearing on the Renewed Summary Judgment Motion. *Id.* at p. 3; Case No.

13-669 ECF 279.

On January 21, 2022, the Court entered an order granting the Extension Motion

("Extension Order") and providing that

> Debtor's response/memorandum of law in opposition to the Motion of JPMorgan
> Chase Bank, N.A. for Summary Judgment ('Summary Judgment Motion') must
> be filed on or before January 26, 2022. No further extensions will be granted. If
> Debtor does not file a timely response/memorandum of law in opposition to the
> Summary Judgment Motion on or before January 26, 2022, the Debtor will not be
> permitted to make any argument at the hearing on the Summary Judgment
> Motion.

Case No. 13-669 ECF 281.

Despite being given yet another opportunity to respond to Chase's position, which it had

asserted since February 2021, that the *D'Oench Duhme* doctrine and/or 12 U.S.C. § 1823(e)

warranted summary judgment in its favor, the Debtor still did not file a response to the Renewed

Summary Judgment Motion. On February 15, 2022, a hearing was held on the Renewed

Summary Judgment Motion, Motion to Strike, and the First Summary Judgment Motion. The

Motion to Strike was denied as moot based upon Chase's filing of the Renewed Summary

Judgment Motion. *See id.* at ECF 283, 284, 285. At the hearing on the Renewed Summary

Judgment Motion, Debtor's counsel explained that he elected not to file a response, or apparently

make arrangements to have one filed, because at the time the Extension Order was entered, he

was getting ready to leave for a trip out of the United States, and upon his arrival to his overseas

destination, was unable to access documents and the court's website. He subsequently became

sick and had to quarantine, only returning to the office shortly before the hearing on the

Renewed Summary Judgment Motion. However, the Court finds Debtor's counsel's explanation

15

for failing to file a response disingenuous. First, Debtor's counsel failed to provide a response

by: (1) the Debtor's suggested deadline of January 14, 2022 and (2) the Court's further extended

deadline of January 26, 2022. Instead, Debtor's counsel ignored both deadlines and went on his

trip without arranging to have a timely response filed. In addition, the Extension Motion never

mentioned an upcoming overseas trip which could restrict Debtor's counsel's ability to file a

response, as he simply requested an extension until "at least January 14, 2022." *Id.* at ECF 278,

Ext. Mot. p. 3.

## III.    DISCUSSION

For the reasons described more fully below, the Court concludes that Chase's statement

of undisputed facts and supporting evidence, which the Debtor has failed to contradict with any

evidence of her own, establish that there is no genuine dispute that 12 U.S.C. § 1823(e) bars the

Debtor from attempting to use McCusker's alleged misrepresentations respecting the sale of the

Property and Option Agreement to diminish or defeat Chase's interest in the note and mortgage

against the Property which it acquired from the FDIC when no written document executed by

WaMu acknowledging Debtor's equitable interest in the Property by virtue of McCusker's

misrepresentations or the Option Agreement appears in the loan file Chase obtained from the

FDIC in connection with the Property. Therefore, Chase is entitled to judgment as a matter of

law.

### A.  Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a) ("Rule 56"), applicable to bankruptcy

adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, "[t]he court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." "A genuine issue of material fact

is one in which sufficient evidence exists that would permit a reasonable fact finder to return a

verdict for the non-moving party." *Odom v. Philadelphia Parking Auth. (In re Odom)*, 571 B.R.

687, 692 (Bankr. E.D. Pa. 2017). As explained by Rule 56(c)(1)(A)-(B):

> [a] party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by: (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or declarations,
> stipulations…admissions, interrogatory answers, or other materials; or (B) showing
> that the materials cited do not establish the absence or presence of a genuine dispute,
> or that an adverse party cannot produce admissible evidence to support the fact.

Rule 56(c)(3) provides that "[t]he court need consider only the cited materials, but it may

consider other materials on the record."

If the movant is the party with the burden of proof at trial, the movant "must produce

enough evidence to justify a directed verdict in its favor in order to meet its initial burden." *In re*

*Odom*, 571 B.R. at 693. If the movant is the defendant or the party without the burden of proof,

"the movant must demonstrate the absence of a genuine issue of material fact, but the movant is

not required to support the motion with affidavits or other materials that negate the opponent's

claim. Rather, the movant may assert that the party with the burden of proof has not come

forward with evidence to support one or more elements of its claim." *Green v. Didio (In re*

*Didio),* 607 B.R. 804, 808 (Bankr. E.D. Pa. 2019) (citations omitted). Once the movant

satisfactorily meets its initial burden, the non-moving party must generally go beyond the

pleadings and counter with evidence designating specific facts showing that there is a genuine

issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *DiSantis v. Morgan Props.*

*Payroll Servs., Inc.*, Civ. Act. No. 09–6153, 2010 WL 3606267, at *4 (E.D. Pa. Sept. 16, 2010).

Ultimately, in resolving a motion for summary judgment, the court must draw all

reasonable inferences in favor of the non-moving party. *In re Odom,* 571 B.R. at 692. However,

although the Court must draw all inferences in favor of the non-moving party, "[t]he line

between reasonable inferences and impermissible speculation is often 'thin,' but is nevertheless

critical because 'an inference based upon a speculation or conjecture does not create a material

factual dispute sufficient to defeat summary judgment.'" *Prince v. BAC Home Loans Servicing,*

*LP,* Civ. Act. No. 16-CV-1544, 2018 WL 4154947, at *2 (E.D. Pa. Aug. 30, 2018). "Inferences

must flow directly from admissible evidence." *Id.* at *3. Furthermore, if the evidence offered by

the non-moving party is merely colorable, or is not significantly probative, summary judgment

may be granted. *Chusid v. First Union Nat'l Bank*, Civ. Act. No. 97-4134, 1998 WL 42292 at *3

(E.D. Pa. Jan. 21, 1998).

Where, as here, the non-moving party fails to respond to the motion for summary

judgment, Rule 56(e) applies. *See Rosado v. Smith*, No. 5:21-cv-00515, 2022 WL 225564, at *1-

2 (E.D. Pa. Jan. 26, 2022); *Nellson v. United States Fed. Bureau of Prisons*, Civ. Act. No. 3:20-

cv-00963, 2022 U.S. Dist. LEXIS 12699, at *17 (M.D. Pa. Jan. 24, 2022). Pursuant to Rule

56(e):

> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order.

As discussed *supra*, the Debtor was on notice since early February 2021 that Chase

intended to pursue summary judgment based upon the *D'Oench Duhme* doctrine and 12 U.S.C.

§1823(e). After Chase filed its Amended Answer formally asserting 12 U.S.C. § 1823(e) as an

affirmative defense in early June 2021, she then had until September 1, 2021 to obtain any

additional discovery she needed on that defense and had months after receiving Chase's response

at the end of August 2021 to seek the Court's assistance with attempting to rectify any discovery

deficiencies before the December 2021 hearing on the First Summary Judgment Motion and

January 2022 response deadline for the Renewed Summary Judgment Motion. To the extent the

Debtor needed additional time to conduct discovery or was unsatisfied with Chase's discovery

response, she never filed with this Court a motion seeking to extend the discovery deadline or to

compel Chase to supplement its discovery responses. Furthermore, Debtor was given multiple

opportunities to respond to Chase's position with respect to the *D'Oench Duhme* doctrine and 12

U.S.C. § 1823(e) and statement of facts made in connection therewith which she did not take

advantage of – first when Chase re-noticed the First Summary Judgment Motion, again when

Chase subsequently filed the Renewed Summary Judgment Motion, and yet again when the

Court granted Debtor's Extension Motion giving her additional time to respond to the Renewed

Summary Judgment Motion.

   With the foregoing context in mind, in the absence of any response from Debtor to the

First Summary Judgment Motion or the Renewed Summary Judgment Motion, the Court will

deem as undisputed the facts set forth in Chase's statement of undisputed facts for purposes of

the Renewed Summary Judgment Motion as Rule 56(e)(2) permits it to do, and will proceed to

assess whether those undisputed facts and supporting materials warrant judgment as a matter of

law in favor of Chase based upon the *D'Oench Duhme* doctrine and/or 12 U.S.C. § 1823(e).

### B.  *D'Oench Duhme* Doctrine and 12 U.S.C. § 1823(e)

   Pursuant to a federal common law doctrine dating back to 1942 referred to as the

"*D'Oench Duhme"* doctrine ("*D'Oench Duhme*" or "the Doctrine"), "secret agreements" may

not be raised as a defense to "ostensibly unconditional obligations" owed "to a bank that the

Federal Deposit Insurance Corporation ('FDIC') has taken over."[4] *Adams v. Madison Realty &*

---

[4] As the Third Circuit Court of Appeals recounted:

>    [t]he seminal case on the subject is *D'Oench, Duhme & Co., Inc. v. Federal Deposit Ins. Corp.*,
>    315 U.S. 447, 86 L. Ed. 956, 62 S. Ct. 676 (1942). D'Oench, Duhme & Company was a securities

*Dev., Inc.,* 937 F.2d 845, 851 (3d Cir. 1991). It is generally thought that 12 U.S.C. § 1823(e)

("Section 1823(e)") codified "the result reached in *D'Oench, Duhme*." *Id.* at 852. Section

1823(e) specifically provides:

> [n]o agreement which tends to diminish or defeat the interest[5] of the Corporation
> [FDIC] in any asset acquired by it under this section or section 11 [12 U.S.C.S.
> §1821], either as security for a loan or by purchase or as receiver of any insured
> depository institution, shall be valid against the Corporation unless such
> agreement – (A) is in writing, (B) was executed by the depository institution and
> any person claiming an adverse interest thereunder, including the obligor,
> contemporaneously with the acquisition of the asset by the depository institution,
> (C) was approved by the board of directors of the depository institution or its loan
> committee, which approval shall be reflected in the minutes of said board or
> committee, and (D) has been, continuously, from the time of its execution, an
> official record of the depository institution.

---

broker and dealer that sold bonds to the Belleville Bank & Trust Company in the 1920s. In 1926,
after the bonds defaulted, the bank asked D'Oench, Duhme to sign new notes so that the bank
could avoid carrying past due bonds on its books. Payments made on the past due bonds were to
be credited against the outstanding balance of the new notes. The receipts for the notes contained
the statement, 'This note is given with the understanding it will not be called for payment. All
interest payments to be repaid.' In 1933, D'Oench, Duhme executed a new note in renewal of the
notes it signed in 1926. The president of D'Oench, Duhme who signed the notes was aware that
they were executed so that the past due bonds would not appear as assets of the bank, and that the
purpose of the interest payments was to 'to keep the notes alive.'

In 1938, the FDIC acquired the D'Oench, Duhme renewal note in a purchase and assumption
transaction after the bank failed. Although the bank had charged off the renewal note in 1935, the
FDIC made a demand for payment in 1938. D'Oench, Duhme responded by producing the written
receipts which clearly showed the agreement that the note would never be enforced. D'Oench,
Duhme also defended by arguing that the note failed for want of consideration.

The United States Supreme Court began its analysis of the question whether the FDIC could
enforce the renewal note against D'Oench, Duhme by determining that federal common law
governed the enforceability of the note. The Court reasoned that federal common law controlled
because the FDIC brought suit under the National Banking Act, the Act of Congress which created
the FDIC. The Court found that the Act evidenced a general policy of protecting the FDIC because
it contained a specific provision which prohibited the misrepresentation of bank assets.
The Court explained that D'Oench, Duhme violated the policy prohibiting the misrepresentation of
bank assets by lending itself to a scheme which had the effect of misleading banking authorities.
D'Oench, Duhme's indulgence in allowing the bank to carry the note as an asset amounted to
continuing permission to mislead bank-examining authorities who inspect the bank's assets on an
on-going basis. Accordingly, the Court held that D'Oench, Duhme was estopped from raising its
secret agreement with the bank as a defense to enforcement of the note.

*Adams v. Madison Realty & Dev., Inc.,* 937 F.2d 845, 851-52 (3d Cir. 1991).

[5] As the Supreme Court explained, even voidable title "is enough to constitute 'title *or* interest'" for purposes of
Section 1823(e). *Langley v. Federal Deposit Ins. Corp.,* 484 U.S. 86, 94 (1987).

12 U.S.C. § 1823(e).

Ultimately, in light of Section 1823(e), the Third Circuit Court of Appeals ("Third Circuit")

declared with respect to the Doctrine that:

> [w]e agree with the Eighth, Ninth and D.C. Circuits that *D'Oench* is not
> applicable federal common law in light of *O'Melveny* and *Atherton*. The Supreme
> Court explained that where it found 'federal statutory regulation that is
> comprehensive and detailed,' it would not supplement that scheme with federal
> common law. Section 1823(e) is comprehensive and detailed, and under
> *O'Melveny* and *Atherton* we do not think *D'Oench* is needed to supplement it.

*Federal Deposit Ins. Corp. v. Deglau,* 207 F.3d 153, 171 (3d Cir. 1999).

The Supreme Court has defined the term "agreement" as used in Section 1823(e) broadly,

holding that "[a] condition to payment of a note, including the truth of an express warranty, is

part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C.

§1823(e) attach." *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 96 (1987). By way of

background, as explained in *Langley*,

> [t]he Langleys purchased land in Pointe Coupee Parish, Louisiana, in 1980. To
> finance the purchase, they borrowed $450,000 from Planters Trust & Savings
> Bank of Opelousas, Louisiana, a bank insured by the FDIC. In consideration for
> the loan, they executed a note, a collateral mortgage, and personal guarantees. The
> note was renewed several times, the last renewal being in March 1982, for the
> principal amount of $468,124.41.
>
> In October 1983, after the Langleys had failed to pay the first installment due on
> the last renewal of the note, Planters brought the present suit for principal and
> interest in a Louisiana state trial court. The Langleys removed the suit, on grounds
> of diversity, to the United States District Court for the Middle District of
> Louisiana, where it was consolidated with a suit by the Langleys seeking more
> than $5 million in damages from Planters and others. The Langleys alleged as one
> of the grounds of complaint in their own suit, and as a defense against Planters'
> claim in the present suit, that the 1980 land purchase and the notes had been
> procured by misrepresentations. In particular, they alleged that the notes had been
> procured by the bank's misrepresentations that the property conveyed in the land
> purchase consisted of 1,628.4 acres, when in fact it consisted of only 1,522, that
> the property included 400 mineral acres, when in fact it contained only 75, and
> that there were no outstanding mineral leases on the property, when in fact there

21

were. No reference to these representations appears in the documents executed by the Langleys, in the bank's records, or in the minutes of the bank's board of directors or loan committee.

In April 1984, the FDIC conducted an examination of Planters during which it learned of the substance of the lawsuits with the Langleys, including the allegations of Planters' misrepresentations. On May 18, 1984, the Commissioner of Financial Institutions for the State of Louisiana closed Planters because of its unsound condition and appointed the FDIC as receiver. The FDIC thereupon undertook the financing of a purchase and assumption transaction pursuant to 12 U.S.C. § 1823(c)(2), in which all the deposit liabilities and most of the assets of Planters were assumed by another FDIC–insured bank in the community. Because the amount of the liabilities greatly exceeded the value of the assets, the FDIC paid the assuming bank $36,992,000, in consideration for which the FDIC received, *inter alia,* the Langleys' March 1982 note.

In October 1984, the FDIC was substituted as a plaintiff in this lawsuit, and moved for summary judgment on its claim.

*Id.* at 88-89.

When the Langleys petitioned the Supreme Court for review of the Fifth Circuit Court of Appeals' affirmance of the Louisiana District Court's order granting FDIC's summary judgment motion, the Supreme Court granted certiorari "on the issue of whether, in an action brought by the FDIC in its corporate capacity for payment of a note, § 1823(e) bars the defense that the note was procured by fraud in the inducement even when the fraud did not take the form of an express promise." *Id.* at 90. In holding that Section 1823(e) does bar that defense, the Supreme Court determined that the term "agreement" covers more than promises to perform acts in the future but rather, encompasses any condition to repayment of an obligation to the bank, grounding its reasoning in the dual purposes of Section 1823(e). *Id.* at 91-92. Specifically, the Supreme Court explained:

[o]ne purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, see 12 U.S.C. §§ 1817(a)(2), 1820(b), and when the FDIC is deciding whether to liquidate a failed bank, see § 1821(d), or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank, see

§§1823(c)(2), (c)(4)(A). The last kind of evaluation, in particular, must be made 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.' Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

A second purpose of § 1823(e) is implicit in its requirement that the 'agreement' not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record 'contemporaneously' with the making of the note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure. Neither purpose can be adequately fulfilled if an element of a loan agreement so fundamental as a condition upon the obligation to repay is excluded from the meaning of 'agreement.'

*Id.* at 91-92.

Significantly, the Supreme Court also held that "knowledge of the misrepresentation by the FDIC prior to its acquisition of the note is not relevant to whether § 1823(e) applies. Nothing in the text would support the suggestion that it is: An agreement is an agreement whether or not the FDIC knows of it…," and further elaborated that "[t]he short of the matter is that Congress opted for the certainty of the requirements set forth in § 1823(e). An agreement that meets them prevails even if the FDIC did not know of it; and an agreement that does not meet them fails even if the FDIC knew." *Id.* at 94, 95.

Ultimately, pursuant to Section 1823(e), "the FDIC is generally insulated from liability for claims predicated on unrecorded side agreements that would diminish or defeat its interest in an asset that the FDIC acquired from a failed bank." *Mendoza v. Doyle Int'l Louisiana, LLC*, Civ. Act. No. 17-00437-BAJ-EWD, 2020 WL 719407, at *2 (M.D. La. Feb. 12, 2020). Section 1823(e) extends to bar both affirmative claims against FDIC as well as defenses rooted in unrecorded side agreements. *Levine v. Resolution Trust Corp. (In re Coronet Capital Co.),* No.

90 B 13646 (FGC), No. 94 Civ. 1187 (LAP), 1995 WL 429494, at *11 (S.D. N.Y. July 20,

1995); *RSR Properties, Inc. v. Federal Deposit Ins. Corp.,* 706 F. Supp. 524, 531 (W.D. Tex.

1989).

It is also well settled that Section 1823(e) applies to protect third-party assignees of the

FDIC. *Simmons First Nat'l. Bank v. Lehman*, No. C–13–02876 DMR, 2015 WL 632393, at *8

(N.D. Cal. Feb. 13, 2015) ("The protections of section 1823(e) and the *D'Oench, Duhme*

doctrine extend to private institutions who acquire assets of failed financial institutions from the

FDIC."); *Fleet Bank of Maine v. Prawer*, 789 F.Supp. 451, 455 (D. Maine 1992); *Settlers' Hous.*

*Serv. v. Schaumburg Bank & Trust Co., N.A. (In re Settlers' Hous. Serv.),* 514 B.R. 258, 271

(Bankr. N.D. Ill. 2014) ("it is enough that the Bank holds the note as an assignee of the FDIC for

it to assert a defense under *D'Oench* and § 1823(e).").

Furthermore, for Section 1823(e) to apply, the "agreement" need not be between the bank

and the borrower. As the Third Circuit explained in *Adams v. Madison Realty and Development*

*Corporation*, a case brought by plaintiffs who executed certain promissory notes in favor of three

banks to obtain loans to invest in tax shelters based upon fraudulent misrepresentations made by

the promoters of those tax shelters to plaintiffs,

> [t]he word 'agreement' in section 1823(e) is not limited to express agreements
> between a bank and a borrower. Rather, an 'agreement' includes any warranty on
> which the performance of a party is conditioned. Plaintiffs claim that the people
> who sold them the tax shelters made a variety of promises which they breached.
> For instance, plaintiffs allege that the promoters of the fraudulent tax shelters
> represented that they would acquire and restore certain historic condominium
> units. In fact, plaintiffs allege, the promoters failed to even acquire over 200 of
> those units. Plaintiffs also detail numerous other specific representations and
> warranties that the defendants breached.
>
> Conceptually, these representations and warranties are promises, the truth of
> which are conditions precedent to the plaintiffs' obligations to repay the notes.
> Thus, under *Langley,* they are 'agreements' that fall within section
> 1823(e)…Since plaintiffs did not make these promises part of the bank's official

>records, they are estopped from raising their claims of fraud in the inducement against the RTC. It is therefore of no moment that the plaintiffs never made an express agreement and had no contact with anyone either at the originator banks or at Empire.

*Adams,* 937 F.2d at 857.

In fact, even an action brought against a bank by a third party to the loan transaction may still be barred by or within the reach of Section 1823(e) where the third party is relying upon/asserting an agreement which would diminish or defeat the value of an FDIC asset. *Tyson Foods v. Adams,* 326 Ark. 300, 308 (1996); *Walsh v. New West Fed. Savings & Loan Assoc.,* 234 Cal. App. 3d 1539, 1545 (Cal. Ct. App. 1991). *See also Royal Bank of Canada v. FDIC,* 733 F. Supp. 1091, 1096 (N.D. Tex. 1990). "[A] traditional lender/borrower relationship is not necessary to apply the doctrine." *Wurzl v. Holloway,* 46 Cal. App. 4th 1740, 1750 (Cal. Ct. App. 1996). Ultimately,

>[w]hile recognizing that the majority of case law addresses situations where the agreements at issue were between the depository institution and obligor/debtors…such a constricted interpretation of this statute [is] inconsistent with the breadth of its language. 'No agreement' is, by its nature, very broad. To defeat the acquiring corporation's interest requires a writing executed by the depository institution *and any person, including the obligor.* The language '…and any person, including the obligor…' mandates that *any* person holding an interest that could diminish or defeat the acquiring corporation's interest fulfill all of the requirements set forth in the statute. This applies to *any* agreement, not just those between the depository institution and the obligor/debtor. This is the clear mandate of the statute.

*Ajootian v. Lamont Lions Club (In re Ajootian),* 119 B.R. 749, 755 (Bankr. E.D. Cal. 1990).

### C. There is no genuine dispute that Section 1823(e) bars Debtor's claims against Chase.

In this Adversary Proceeding, in order to attempt to defeat Chase's interest in an asset it acquired from the FDIC – the facially unqualified note McCusker executed in favor of WaMu secured by a mortgage against the Property – the Debtor raises the Option Agreement and

alleged fraudulent misrepresentations made by McCusker in connection with the sale of the

Property purportedly inducing her to sell the Property, despite the fact that the loan file Chase

obtained from the FDIC contains neither the Option Agreement nor any writing signed by WaMu

acknowledging the alleged misrepresentations purportedly serving as the basis for Debtor's

alleged equitable interest in the Property. This is precisely what Section 1823(e) bars the Debtor

from attempting to do.

For purposes of the Renewed Summary Judgment Motion, it is undisputed that Chase

acquired a note, dated July 9, 2007, in the original principal sum of $232,500 executed by

McCusker in favor of WaMu ("Note") and secured by a mortgage against the Property

("Mortgage," collectively with Note, "Note and Mortgage") from the FDIC acting as WaMu's

receiver, and that Chase is the current holder of the Note and Mortgage. Ren. Summ. J. Mot. St.

Undisputed Facts p. 3. *See also* Grageda Decl. ¶¶ 2, 3; Ex. 1, 2. Because Chase acquired the Note

and Mortgage from the FDIC, in order for the Debtor to assert any agreement against Chase

which would diminish its interest in this asset, the requirements of Section 1823(e) must be

satisfied.[6]

---

[6]      Chase has met its initial summary judgment burden of presenting evidence that it acquired from FDIC an asset in the form of the Note and Mortgage. Ren. Summ. J. Mot. St. Undisputed Facts p. 3. *See also* Grageda Decl. ¶¶ 2, 3; Ex. 1, 2. The Debtor has not come forward citing evidence reflecting a genuine dispute that Chase acquired an asset from FDIC. The Amended Complaint appears to challenge the validity of the Note and Mortgage by alleging that to induce Debtor to sell her the Property, McCusker falsely represented to Debtor and Mr. Bolger that they would have the option of buying back the Property using a credit of 50% of the equity as set forth in the Option Agreement, but McCusker did not intend to honor the Option Agreement and instead, diverted the equity that remained after the 2005 sale of the Property to her company, J&J Realty, suggesting that Debtor and Mr. Bolger were induced to sell the Property by fraud. Am. Compl. ¶¶ 8, 9, 37-38, 44. However, the Option Agreement actually appears to provide that Debtor was to receive a credit in the amount of 50% of whatever equity was in the Property at the time McCusker re-conveyed it to the Debtor. *See* Compl. Ex. C. In any event, the Debtor has cited to no evidence whatsoever that McCusker did not intend to honor the Option Agreement had it been exercised. In fact, the Amended Complaint itself does not even *allege* that Debtor at any point during her tenancy ever attempted to exercise the Option Agreement, let alone that McCusker did not honor it. Had Debtor attempted to exercise the Option Agreement, McCusker may have given Debtor credit for the equity that J&J Realty obtained from the 2005 sale to the extent that is what the Option Agreement required. In the absence of any evidence of, or even an allegation that, Debtor attempted to exercise her option to re-purchase and McCusker failed to honor it in accordance with the terms of the Option Agreement, the Court has no basis to conclude for purposes of the Renewed Summary Judgment Motion that McCusker's representations with respect to the Option Agreement were false.

Because the Debtor attempts to assert the Option Agreement and the truth of McCusker's representations in connection with the sale of the Property as conditions to the enforceability of the Note and Mortgage, the Option Agreement and McCusker's alleged fraudulent representations inducing Debtor to sell the Property constitute "agreements" as defined by the Supreme Court for purposes of Section 1823(e). *See Langley,* 484 U.S. at 96.

It is undisputed for purposes of the Renewed Summary Judgment Motion that the WaMu loan file transferred to Chase upon Chase's acquisition of the Note and Mortgage from the FDIC "does not contain any reference to Suzanne Bolger or her then-husband having any interest in the Property, nor does it otherwise indicate that there was any fraud perpetrated in connection with

---

To the extent Debtor may suggest that McCusker made misrepresentations respecting the Lease Agreement, again, she has not cited to evidence reflecting what those misrepresentations would have been. At least with respect to the monthly rent Debtor would be required to pay as a tenant, the Lease Agreement Debtor signed explicitly provides that "Tenant agrees that the monthly rent shall be adjusted from time to time to reflect any increases in property taxes and/or homeowner's insurance policy premiums during Tenant's occupancy." Compl. Ex. D. There is simply no evidence that McCusker and Debtor agreed that McCusker or J&J Realty would never increase the rent during Debtor's tenancy.

There is no evidence presented that McCusker made any other false representations inducing Debtor to sell the Property. The summary judgment record is similarly devoid of any evidence that Debtor did not consent to the distribution of proceeds from the 2005 sale. There is certainly no evidence on this summary judgment record that prior to this Adversary Proceeding, she ever raised any objections to or concerns with respect to the distribution. Based on the foregoing, the Debtor simply has not presented any evidence in connection with this Renewed Summary Judgment Motion giving the Court a basis to conclude that she was defrauded by McCusker into giving up title to the Property such that Chase's interest in the Note and Mortgage would have been impaired. To the extent such evidence may exist in this Adversary Proceeding in connection with another motion or matter, Rule 56(c) specifically provides that the court need only consider materials cited for purposes of the summary judgment record. *See also* Rule 56(c) Advisory Comm. Notes ("Subdivision (c)(3) reflects judicial opinions and local rules provisions stating that the court may decide a motion for summary judgment without undertaking an independent search of the record.").

Furthermore, there is no evidence on this summary judgment record suggesting that the defense of "fraud in factum," would apply here. As the Supreme Court explained, fraud in factum is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Langley,* 484 U.S. at 93. Ultimately, fraud in factum requires the misrepresentation to go to the very nature of the instrument itself and that the alleged victim establish excusable ignorance of the contents of the signed writing. *Kuhlmann v. Sabal Fin. Group LP,* 26 F. Supp. 3d 1040, 1056 (W.D. Wash. 2014). The summary judgment record is devoid of evidence that when Debtor signed the deed transferring title to the Property to McCusker, she did not understand that she was agreeing to transfer title to McCusker in exchange for the right to rent the premises and to re-acquire title pursuant to the Option Agreement. There is similarly no evidence in this summary judgment record that Debtor did not understand, did not review, or did not have the opportunity to review the deed conveying title to McCusker, the Option Agreement, the Lease Agreement, or the distribution of proceeds from the Property's sale. Accordingly, there is no evidence before the Court that the fraud in factum defense would apply to this Adversary Proceeding for purposes of the Renewed Summary Judgment Motion.

the Washington Mutual loan" and that "[t]here is no written agreement in Washington Mutual's

files that has been signed by Washington Mutual acknowledging Plaintiff's claimed interest in

the Property." Ren. Summ. J. Mot. St. Undisputed Facts p. 3. *See also* Grageda Decl. ¶¶ 3, 4; Ex.

3.[7] This is fatal to Debtor's claims attempting to invalidate Chase's Note and Mortgage against

the Property. As the Third Circuit explained,

> [p]laintiffs can only raise the existence of these false representations and
> warranties…to the extent they have complied with the formalities of section
> 1823(e), *i.e.*, to the extent these promises were made part of the bank's official
> records. Since plaintiffs did not make these promises part of the official records,
> they are estopped from raising their claims of fraud in the inducement…

*Adams,* 937 F.2d at 857.

The same applies to the Debtor. Debtor has not presented evidence contradicting the fact,

taken as undisputed for purposes of the Renewed Summary Judgment Motion, that Debtor's

alleged equitable interest in the Property was not referenced in the WaMu loan file for the Note

and Mortgage in a writing signed by WaMu. The Court has no evidence before it that the Option

Agreement was incorporated into the WaMu loan file or referenced therein, nor that WaMu

acknowledged that the enforceability of the Note and Mortgage against the Property was

conditioned on the truth of McCusker's representations made in connection with the 2005 sale,

particularly her promise to allow Debtor to repurchase the Property using a credit of 50% of the

equity. Simply put, it is undisputed for purposes of the Renewed Summary Judgment Motion that

the WaMu loan file for the Note and Mortgage contains no signed, written acknowledgment

from WaMu that Debtor retained an equitable interest in the Property based upon McCusker

granting the Debtor an option to re-acquire the Property pursuant to certain terms that she did not

---

[7] Exhibit 3 to the Grageda Declaration submitted in support of the Renewed Summary Judgment Motion is a copy of
the WaMu loan file containing certain redactions which appear largely related to protecting confidential information
such as social security numbers, birth dates, account numbers, and credit scores, as well as contact information like
phone numbers, fax numbers, and email addresses. *See* Grageda Decl. ¶ 4, Ex. 3.

intend to honor or based upon any other misrepresentations which McCusker may have made in connection with the Property's sale, as Section 1823(e) would require.[8] Therefore, Section 1823(e) bars Debtor from raising the claims in this Adversary Proceeding, which are based on the Option Agreement and misrepresentations allegedly made in connection with the Property's 2005 sale, against Chase to void its interest in the Note and Mortgage.[9]

## IV.    CONCLUSION

Based upon all the foregoing, Chase's Renewed Summary Judgment Motion is granted, as there is no genuine dispute that Chase is entitled to judgment as a matter of law based upon the applicability of Section 1823(e).

---

[8]    It is worth noting that "neither section 1823(e) nor *D'Oench* can be overcome by piecing together writings in the bank's records. 'It is the actual, written agreement which the law requires to be an official record of the depository institution.' 'Scattered evidence in corporate records from which one could infer the existence of an agreement does not meet the requirements of the statute.'" *In re Settlers' Hous. Serv.,* 514 B.R. at 272 (internal citations omitted). For that reason, discreet references in the WaMu loan file to Bolger's 2005 transfer of the Property to McCusker, a matter of public record, or to the fact that the Property was non-owner occupied simply are not sufficient to satisfy the requirements of Section 1823(e) to permit Debtor to raise the Option Agreement or McCusker's alleged misrepresentations against Chase in the absence of an acknowledgement contained in WaMu's records that the enforceability of the Note and Mortgage was conditioned upon the truth of McCusker's representations to Debtor, particularly in connection with her intent to honor the Option Agreement.

Courts have admittedly acknowledged that Section 1823(e) does not apply "where the documents or instruments that the FDIC [or its successor] seeks to enforce facially manifest bilateral obligations and serve as the basis of the parties' defense." *In re New Valley Corp.,* 168 B.R. 82, 89 (Bankr. D. N.J. 1994) (citing *Howell v. Continental Credit Corp.*, 655 F.2d 743, 747 (7th Cir. 1981)). In that case, "[t]he agreement sought to be enforced only has to flag the issue to subsequent purchasers. The fact that the court has to go outside to determine strength and validity of the defenses is not fatal where the foundation and basis of the defense is in the document…" *In re New Valley Corp.,* 168 B.R. at 89. *See also, Howell,* 655 F.2d at 746-47. However, here, the evidence reflects that Chase merely seeks to enforce the facially unconditional Note and Mortgage imposing a unilateral obligation on the maker to pay a sum certain to the bank without reference to any bilateral obligations with respect to WaMu, and its successor, Chase. Ren. Mot. Summ. J. Ex. 1, 2. Thus, the strictures of Section 1823(e) still apply and cannot be satisfied merely by a few discreet references in the WaMu loan file to the sale of the Property from Debtor to McCusker and the Property's status as non-owner occupied.

[9] The plaintiff/debtor asserted in the Amended Complaint that this bankruptcy court has subject matter jurisdiction to decide all claims raised in the Adversary Proceeding, and that the matter is core, permitting entry of a final judgment. Am. Compl. ¶ 2. Chase has not raised any challenge to the jurisdiction assertion. Am. Ans. ¶ 2. Additionally, on December 19, 2019, Chase filed a secured proof of claim in the Second Bankruptcy Case, docketed on the claims register as claim number 2. As the Court determined in connection with its order granting the First Motion to Dismiss with respect to the Original Complaint, "[t]o the extent that the plaintiff may prevail in this proceeding, the defendant's claim could be disallowed. Thus the proceeding is core as to this defendant." Case No. 13-669 ECF 17 St. p. 4, n.5 (citing 28 U.S.C. § 157(b)(2)(B); *Kurz v. EMAK Worldwide, Inc.*, 464 B.R. 635, 644 (D. Del. 2011); *In re Iridium Operating LLC*, 285 B.R. 822, 831-32 (S.D.N.Y. 2002); *In re Southeastern Materials, Inc.*, 467 B.R. 337, 361 (Bankr. M.D.N.C. 2012); *In re Asousa Partnership*, 276 B.R. 55, 76-77 (Bankr. E.D. Pa. 2002)). The same applies now, permitting entry of a final judgment.

Date: March 10, 2022

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge